# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

JANUARY 1999 SESSION

FILED

May 20, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE**, | * | C.C.A. NO. 03-C-01-9801-CC-00034 |
| APPELLANT, | * | SULLIVAN COUNTY |
| VS. | * | Hon. Phyllis H. Miller, Judge |
| **CHRIS EUGENE ETTERS**, | * | (Pretrial Diversion) |
| APPELLEE. | * | |

For Appellant:

John Knox Walkup
Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN  37243-0493

Albert L. Partee, III
Senior Counsel
Enforcement Division
425 Fifth Avenue North, 2nd Floor
Nashville, TN  37243-0494

Lewis Combs, Jr.
Assistant District Attorney General
Blountville, TN  37617

For Appellee:

David Overbay
1740 Euclid Avenue
Bristol, VA  24203

Vincent Sikora
P.O. Box 821
Piney Flats, TN 37686

OPINION FILED: _____

AFFIRMED

NORMA MCGEE OGLE, JUDGE

## OPINION

The defendant, Chris Eugene Etters, was indicted on February 12, 1997, on one count of vandalism in the amount of $10,000 or more and on one count of violating the Tennessee Water Quality Act. The defendant applied for pretrial diversion. On June 2, 1997, the District Attorney General denied the request. On January 7, 1998, the Criminal Court of Sullivan County overruled the District Attorney General and granted the defendant pretrial diversion. Accordingly, on February 10, 1998, the District Attorney General entered into a memorandum of understanding with the defendant, setting forth the conditions of the defendant's pretrial diversion. The State additionally applied for permission to appeal the interlocutory order of the trial court pursuant to Tenn. R. App. P. 9, which application was granted by the trial court and by this court. In this appeal, the State asserts that the trial court incorrectly overruled the District Attorney General's denial of pretrial diversion.

Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

## I. Factual Background

In 1993, the defendant, Chris Eugene Etters, leased a tract of land on Riverport Road in Kingsport, Tennessee, and began operating AZROK Corporation (AZROK). AZROK processed and distributed hardwood bark generated by the local Mead Paper facility. Previously, Mead Paper had been disposing of approximately 75,000 tons of hardwood bark per year in landfills. Seizing an opportunity to turn what had been Mead Paper's waste into a viable commercial product, AZROK began processing the leftover bark into compost landscape mulch for resale. As a result, the two companies won the 1993-94 Tennessee Association of Business Excellence in Solid Waste Management Award for their joint effort to conserve landfill space and find a beneficial use for the bark material. At this time, the defendant's business was thriving, but trouble was looming on the horizon.

Problems began for AZROK in August, 1993 when the defendant was informed by the

2

Tennessee Department of Environment and Conservation (TDEC), Division of Solid Waste Management (DSWM), that he was engaged in the unauthorized processing of solid waste in violation of the Solid Waste Disposal Act. From August, 1993 to August, 1995 the defendant met with various agents of DSWM on numerous occasions and initiated efforts to comply with their requirements. However, he was unable to fully execute the required measures due to the size and unfortunate location of his business.

AZROK was located on a tract of land adjacent to a public road and the Holston Army Ammunition Plant (HAAP) property and near a sluice of the Holston river. Furthermore, unknown to the defendant at the time he leased the lot, the AZROK business was on or adjacent to a former city dump site.

When AZROK mulched its bark and placed the mulch in piles for the purpose of aging, the piles of mulch would occasionally spontaneously combust. When AZROK employees sprayed the mulch with water in an attempt to control the fires or when it rained, tannins would leach from the mulch, and another chemical (TEC) would leach from the city's old dump site. The defendant built retaining ponds and excavated a ditch in order to control the leachate, but he could not control the flow of leachate off-site. Personnel from the TDEC Division of Water Pollution Control inspected the site and witnessed leachate flowing across Riverport Road and draining into the nearby sluice of the Holston River.

Mead Paper conducted tests of the mulch product and concluded that the mulch was not hazardous to the public using the product or to AZROK employees. Additionally, the Tennessee Department of Health, Epidemiology Division, concluded that the contaminants in the mulch were not a hazard to the public and that the contaminants in the leachate were not highly concentrated enough to warrant public concern. However, the State alleged that between 1994 and 1995, the defendant failed to contain the leachate, failed to control the outbreaks of fires on the site, failed to comply with the

3

Permit-by-Rule requirements of a solid waste processing facility, failed to file adequate financial assurance with the Commissioner of TDEC, and failed to pay the annual maintenance fee required of persons operating an approved solid waste processing facility.

Therefore, on August 4, 1995, the Commissioner of TDEC ordered the defendant to immediately cease accepting waste at his facility and ordered him to close the facility. Closing the facility entailed the removal of all solid waste and solid waste constituents within thirty days. In addition, the Commissioner ordered the defendant to pay restitution in the amount of $76,433.27.

The defendant ceased operation of AZROK, but he did not remove the bark materials from the site. As a result of the defendant's efforts to comply with the TDEC's requirements, his business had become insolvent. Moreover, the defendant and Mead Paper disagreed over who was responsible for the cleanup of the site. Meanwhile, the leachate continued to flow off-site.

Over a period of time, the AZROK operation caused $4,000 damage to a fence on the Army's adjacent property. Moreover, the leachate allegedly contaminated soil on the Army's property, requiring the removal of the soil. The Army sought restitution from the defendant for these expenses.

Mr. Jerry Fulkerson and Mr. Walter Nat Smith, agents of TDEC, were responsible for inspecting the AZROK site at various times. In affidavits, both Mr. Smith and Mr. Fulkerson alleged that the defendant had threatened them while they were visiting the AZROK site.

However, Mr. Fulkerson submitted two inconsistent versions of the incident in which he was threatened by the defendant. During an interview with the probation officer who prepared the pretrial diversion report, Mr. Fulkerson stated that "...during the investigation the defendant threatened him and 'pulled a gun' on him as well as other members of the Tennessee Department of Energy and Conservation." In contrast, in his affidavit, Mr. Fulkerson did not allege that the defendant had ever

4

"pulled a gun" on him. Rather, he stated that he had once seen a gun in the defendant's truck. Mr. Fulkerson attested that, on that occasion, the defendant did not threaten any TDEC agents. The only threat by the defendant described in Mr. Fulkerson's affidavit occurred during a telephone conversation.

Mr. Smith stated in his affidavit that, on one occasion when he was inspecting the AZROK site and discussing compliance measures with the defendant, the defendant expressed disagreement with the on-going enforcement action and stated that he had something that would take care of the problem. The defendant then placed his right hand on the small of his back. Mr. Smith inferred that the defendant had a weapon concealed on his person.

As stated above, the defendant was indicted on one count of vandalism and on one count of violating the Tennessee Water Quality Act. According to the pretrial diversion report, the defendant was forty-four years old, married, and the father of four children. His family was supportive. Despite poor grades, the defendant had graduated from high school in 1973 and had since developed a good work history. His criminal history consisted of three speeding tickets. He had no history of alcohol or drug abuse as an adult. As a juvenile, the defendant drank alcohol for a short period of time and experimented with marijuana twice on one day when he was approximately seventeen years old.

The defendant was apologetic and remorseful for any harm he may have caused to others as a result of his business. He maintained that Mead Paper was responsible for removing the waste material following the closing of the AZROK facility. Therefore, he contended that any damages caused by the leftover bark materials and the leachate were not attributable to him. Further, he asserted that, due to his business' insolvency, he was unable to pay for the damages. A number of friends and family members wrote letters vouching for the defendant's good character and concern for the environment.

5

In a letter denying the defendant's request for pretrial diversion, the District Attorney General stated that he had considered "the pretrial diversion report, a clean-up estimate by Holston Defense, Affidavits from Mr. Nat Smith and Mr. Jerry Fulkerson, letters sent on behalf of Mr. Etters, and other information from the file." The District Attorney General then listed the following grounds upon which his denial rested:

> (1) The defendant was ordered by the Commissioner of the Department of Environment to cease business at his location by order dated August 4, 1995. The offenses listed in the Presentment occurred, at least partially, after the Commissioner's Order. The allegation of water pollution was listed as occurring over eight months after the Order was entered. The Order also states a history of substantial non-compliance with state regulations during the course of the defendant's mulching operation.

> (2) Mr. Walter Nat Smith and Mr. Jerry Fulkerson both filed affidavits stating that the defendant threatened them during their work at the defendant's work site. In both instances, a handgun was the perceived weapon in connection with the threats. The threats occurred over a period of time and was obviously in response to their investigation of the defendant's facility.

> (3) The Presentment alleges criminal activity which occurred over an extended period of time and which caused extraordinary damages to the victim's property.

> (4) The defendant does not have a criminal history, but does admit to using an illegal drug on at least two occasions.

> (5) The educational history in the pretrial diversion report shows a poor academic record. However, it was noted that the defendant did graduate high school.

The Criminal Court of Sullivan County overruled the District Attorney General and granted the defendant pretrial diversion. The trial court held that the District Attorney General had abused his discretion. Specifically, the trial court held that the District Attorney General had failed to enumerate or assign due significance to all relevant factors and that, in any case, there was no substantial evidence in the record to support the prosecutor's denial of pretrial diversion. The trial court ordered that the State enter into a Memorandum of Understanding with the defendant, granting pretrial diversion for a period of two years. In addition the trial court ordered:

6

1. The defendant shall pay restitution to HAAP in the amount of $4,000 to rebuild the fence damaged by the AZROK operation.

2. The defendant shall pay TDEC $4,949.55 in past due maintenance fees, interest, and penalties.

3. The defendant must perform three hundred hours of community service.

4. The defendant must pay a monthly supervision fee of $30 and court costs.

## II. Analysis

### A. Pretrial Diversion Generally

The Pretrial Diversion Act provides a means of avoiding the consequences of a public prosecution for those who have potential for rehabilitation. See Tenn. Code Ann. § 40-15-105 (1997 and Supp. 1998). The pretrial diversion program allows a district attorney general to suspend prosecution against a qualified defendant for a period of up to two years. Id. Whether to grant or deny an application for pretrial diversion is in the discretion of the district attorney general. Id.; State v. Pinkham, 955 S.W.2d 956, 959 (Tenn. 1997); State v. Hammersley, 650 S.W.2d 352, 353 (Tenn. 1983); State v. Carr, 861 S.W.2d 850, 855 (Tenn. Crim. App. 1993); State v. Freeman, No. 03C01-9712-CC-00523, 1999 WL 96272, at *2 (Tenn. Crim. App. at Knoxville, February 22, 1999).

In making the initial determination of whether diverson is warranted, the district attorney general must consider (1) the circumstances of the offense; (2) the defendant's criminal record; (3) the defendant's social history; (4) the defendant's physical and mental condition; (5) the deterrent effect of punishment upon other criminal activity; (6) the defendant's amenability to correction; (7) the likelihood that pretrial diversion will "serve the ends of justice" and the best interests of the defendant and the public; and (8) the defendant's "attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility, and attitude of law enforcement." State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993) (citing State v. Markham, 755 S.W.2d 850, 852-53 (Tenn. Crim. App.

7

1988)).

The nature and circumstances of the alleged offenses are not the only appropriate factors to be considered upon application for diversion but may alone provide a sufficient basis for denial. Carr, 861 S.W.2d at 855; State v. Sutton, 668 S.W.2d 678, 680 (Tenn. Crim. App. 1984); State v. Cavnor, No. 02C01-9704-CR-00155, 1998 WL 148320, at *3 (Tenn. Crim. App. at Jackson, March 31, 1998), perm to appeal denied, (Tenn. 1999). However, the circumstances of the case and a generalized need for deterrence "cannot be given *controlling* weight unless they are 'of such overwhelming significance that they [necessarily] outweigh all other factors.'" Washington, 866 S.W.2d at 951 (emphasis in original) (quoting Markham, 755 S.W.2d at 853). Where there are no "such exceptional circumstances, 'the district attorney general must consider evidence which tends to show that the applicant is amenable to correction by diversion and is not likely to commit further criminal acts.'" Id.; see also State v. Winsett, 882 S.W.2d 806, 810 (Tenn. Crim. App. 1993).

When deciding whether to enter into a memorandum of understanding under the pretrial diversion statute, a prosecutor should focus on the defendant's amenability to correction. Any factors which tend to accurately reflect whether a particular defendant will or will not become a repeat offender should be considered. Such factors must, of course, be clearly articulated and stated in the record in order that a meaningful appellate review may be had. Pinkham, 955 S.W.2d at 959-960 (quoting Hammersley, 650 S.W.2d 355); see also State v. Curry, No. 02S01-9709-CC-00079, 1999 WL 115113 (Tenn. at Dyersburg, March 8, 1999).

Furthermore, if the district attorney general denies pretrial diversion, the denial must be in writing and must include "an enumeration of the evidence that was considered and a discussion of the factors considered and weight accorded each." Pinkham, 955 S.W.2d at 960. This "requirement entails more than an abstract statement in the record that the district attorney general has considered these factors." State v. Herron, 767 S.W.2d 151, 156 (Tenn. 1989). Instead, the factors considered

8

"must be clearly articulable and stated in the record... ." Id. The fact that a defendant bears the burden of demonstrating suitability for diversion does not relieve the prosecutor's obligation to examine all of the relevant factors and set forth the required findings. Pinkham, 955 S.W.2d at 960; see also Curry, No. 02S01-9709-CC-00079, 1999 WL 115113, at *3.

If the application for pretrial diversion is denied, the defendant may appeal by petitioning the trial court for a writ of certiorari. Tenn. Code Ann. § 40-15-105(b)(3) (1997 and Supp. 1998). On a petition for certiorari, the hearing conducted by the trial judge is limited to two issues: (1) whether the accused is eligible for diversion; and (2) whether the district attorney general abused his discretion in refusing to divert the accused. State v. Watkins, 607 S.W.2d 486, 488-89 (Tenn. Crim. App. 1980); State v. Cavnor, No. 02C01-9704-CR-00155, 1998 WL 148320, at *3. Moreover, the only evidence that may be considered by the trial court is the evidence that was considered by the district attorney general. Winsett, 882 S.W.2d at 810. The trial court may conduct a hearing only to resolve any factual disputes raised by the prosecutor or the defendant concerning the application, but not to hear additional evidence that was not considered by the prosecutor. See Pinkham, 955 S.W.2d at 960.

In State v. Curry, our supreme court announced the standard of review that an appellate court must apply in pretrial diversion cases:

> The action of the prosecutor is presumptively correct, and is subject to review by the trial court only for an abuse of discretion. The record in this regard must show an absence of any substantial evidence to support the refusal of the district attorney general to enter into a memorandum of understanding before a reviewing court can find an abuse of discretion. *The appellate court must determine whether the trial court's decision is supported by a preponderance of the evidence.*

No. 02S01-9709-CC-00079, 1999 WL 115113, at *4 (emphasis added); see also Pinkham, 955 S.W.2d at 960.

9

## B. Application of the Law

On appeal, the State argues that the trial court erred by overruling the District Attorney General's denial of pretrial diversion.[1] The State contends that the trial court erred by tacitly re-weighing the relevant factors and deciding that the defendant was amenable to correction.

Initially, we concur in the trial court's finding that the District Attorney General failed to enumerate or assign weight to all of the factors relevant in pretrial diversion cases. Although the District Attorney General stated in his denial letter that he considered the pretrial diversion report and the letters sent on behalf of the defendant, the prosecutor did not discuss the defendant's favorable social history, lack of criminal record, and potential for rehabilitation. The failure of the District Attorney General to consider and articulate all of the relevant factors constituted an abuse of discretion. See Curry, No. 02S01-9709-CC-00079, 1999 WL 115113, at *6.

Moreover, a preponderance of the evidence supports the trial court's determination that the circumstances of the case were not "of such overwhelming significance that they [necessarily] outweigh[ed] all other factors.'" Washington, 866 S.W.2d at 951 (citation omitted). The District Attorney General denied pretrial diversion on five grounds. On appeal, the State contends that three of the five grounds were each a sufficient and independent ground to deny diversion:

> (1) The defendant was ordered by the Commissioner of the Department of Environment to cease business at his location by order dated August 4, 1995. The offenses listed in the Presentment occurred, at least partially, after the Commissioner's Order. The allegation of water pollution was listed as occurring over eight months after the Order was entered. The Order also states a history of substantial non-compliance with state regulations during the course of the defendant's mulching operation.
>
> (2) Mr. Walter Nat Smith and Mr. Jerry Fulkerson both filed affidavits stating that the defendant threatened them during their work at the defendant's work site. In both instances, a handgun was the perceived weapon in connection with the threats. The threats

---

[1] The defendant proceeded pro se on appeal with only the advice of attorneys Vince Sikora and David Overbay. The case was submitted for a decision on the record and the appellant's brief, with oral argument.

occurred over a period of time and was obviously in response to their investigation of the defendant's facility.

(3) The Presentment alleges criminal activity which occurred over an extended period of time and which caused extraordinary damages to the victim's property.

With respect to the first ground, the State cites four separate instances of discharge of pollutants by AZROK after the State had warned the defendant and prescribed curative measures. The Commissioner of TDEC described these instances in his August 4, 1995, order closing the AZROK facility. The State asserts that these episodes demonstrate the defendant's willful violation of state laws and regulations. Moreover, the State argues that a grand jury subsequently found that the defendant wilfully and knowingly polluted the Holsten River on April 21, 1996. According to the State, the prosecutor was entitled to rely upon the Commissioner's order and the finding of the grand jury in denying the defendant pretrial diversion.

The trial court found no substantial evidence to suggest that the defendant willfully ignored the TDEC's requirements. The court observed that the record is replete with the defendant's efforts to comply with the requirements, including spraying mulch piles to control fires, building ditches and ponds to catch runoff, and testing the toxicity of the mulch and leachate. In conclusion, the trial court stated, "The Court does not accept the premise that because the defendant's efforts were unsuccessful, he willfully failed to comply with TDEC's rules and regulations."

Furthermore, the trial court concluded that it could find no evidence that the defendant continued his mulching business after August 4, 1995. The trial court noted that the record was devoid of any officer's report or other document indicating that the pollution of the river which is alleged to have occurred on April 21, 1996, was caused by anything other than leftover bark materials and leachate from the city dump site.

11

As to the second ground for denial of pretrial diversion, the State argues that the threats made by the defendant were significant enough to warrant the prosecutor's denial of pretrial diversion. The State contends that these threats were clearly designed to chill the regulatory zeal of Mr. Fulkerson and Mr. Smith by placing them in fear of bodily harm should they continue their enforcement efforts.

The trial court found no substantial evidence to support the State's belief that the defendant threatened TDEC employees with a handgun. As explained earlier, Mr. Fulkerson's affidavit differs materially from an interview he gave to the probation officer who prepared the pretrial diversion report. In his affidavit, Mr. Fulkerson related only one actual threat by the defendant which occurred during a telephone conversation. Additionally, Mr. Smith did not relate any explicit threat by the defendant, nor did he ever witness the defendant in possession of a handgun.

As to the third ground that the defendant's vandalism occurred over an extended period of time, the State argues that the defendant's vandalism continued even after the August 4, 1995, administrative order closing the AZROK facility. With respect to the amount of damage to the Army's property, the State concedes that the damage estimates contained in the record reflect a discrepancy.

The trial court found that any damage caused by the defendant's operation of his business occurred between April 20, 1995, and the closing of the AZROK facility on August 4, 1995. The trial court reasoned that from August 4, 1995, to October 31, 1996, any damage was attributable to runoff from the materials remaining on the property and leachate from the city dump site. The trial court concluded, "There is no evidence that the defendant actively caused any damage during this period but that, instead, he was embroiled in a dispute with Mead Corporation over cleanup of the site; and his company was insolvent."

12

As to the extent of damage to the Army's property, the trial court noted that the record reveals a preliminary assessment of damages on July 22, 1996, of only $24,000. Yet, on May 27, 1997, with no explanation or itemization of damages, the damage assessment rose to "2.1M." Moreover, the trial court reasoned that the legislature has provided that a person who commits a Class C felony is eligible for pretrial diversion; therefore, the District Attorney erred in relying upon the fact that the damages exceeded $ 10,000.

We conclude that the record contains ample evidence to support the trial court's decision to overrule the District Attorney General's denial of pretrial diversion. Accordingly, the judgment of the trial court is affirmed.

_____
Norma McGee Ogle, Judge

CONCUR:

_____
James Curwood Witt, Jr., Judge

_____
John K. Byers, Senior Judge

13